COMMONWEALTH vs. WILLIAM MARANGIELLO.

Suffolk. January 9, 1991. - June 20, 1991.

Present: LIACOS, C.J., WILKINS, NOLAN, O'CONNOR, & GREANEY, JJ

*Evidence*, Relevancy and materiality, Knife. *Practice, Criminal*, Question-
ing of witness by judge, Agreement between prosecutor and witness,
Argument by prosecutor. *Identification.*

At a criminal trial, the judge properly admitted in evidence a knife and
testimony about a second knife found in the vicinity of the defendant
when he was arrested, where the evidence was competent to show that
at a time not too remote from the stabbing of the victim the defendant
possessed instruments that could have been used in the commission of
the crime. [456-457]

In the circumstances of a criminal trial, the judge's questioning of the vic-
tim, who was testifying with the assistance of two interpreters because
of a handicap, was appropriate, where he properly determined there
was a need for clarification of the victim's testimony and where the
judge's involvement was not overbearing. [457-462]

There was no merit to a criminal defendant's claim, presented for the first
time on appeal, with respect to the judge's treatment of the victim's
testimony that he was unsure whether the defendant was the person
who had attacked him. [462]

At a criminal trial, the prosecutor's closing arguments with respect to the
credibility of the witnesses as manifested by their testimony were not
improper and created no substantial risk of a miscarriage of justice.
[462-465]

INDICTMENTS found and returned in the Superior Court
Department on July 13, 1988.

The cases were tried before *Robert W. Banks*, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Charles W. Rankin* for the defendant.

*Frank Santisi*, Assistant District Attorney, for the Com-
monwealth.

O'CONNOR, J. Following a jury trial, the defendant was convicted of armed assault with intent to murder, assault and battery by means of a dangerous weapon, and armed robbery. This is an appeal from those convictions. The defendant raises three issues on appeal, namely whether (1) the trial judge erred by admitting in evidence two knives found by police officers at the scene of the defendant's arrest ten weeks after the criminal events, (2) whether the judge erred by personally questioning the victim-witness concerning his ability or inability in the courtroom to identify his assailant, and (3) whether the prosecutor impermissibly vouched for the credibility of the only witness who identified the defendant as the assailant. The Appeals Court reversed the convictions, reasoning that "the cumulative effect of what occurred at trial was potentially so prejudicial to the defendant as to require a new trial." 29 Mass. App. Ct. 259, 260 (1990). We allowed the Commonwealth's application for further appellate review, and we now affirm the convictions.

For background purposes, we briefly state the facts the jury could have found. Then, as we consider each issue raised by the defendant, we shall recite such additional facts as are especially pertinent to that issue. On the evening of September 4, 1987, Scott Nicholson, a thirty-four year old man, was at a café in East Boston at which he ate dinner and drank twelve bottles of beer. At approximately 11:30 P.M., Nicholson left the café in the company of Veronica Surface, Lori Heil, and a man. They got into Heil's automobile. The automobile stopped at an abandoned area near the waterfront, and Nicholson, Surface, and the man walked toward the water. The man grabbed Nicholson from behind, held a knife to his throat, and pushed him to the ground. Surface emptied Nicholson's pockets, and then the man stabbed Nicholson three times in the neck, as a result of which Nicholson was hospitalized.

We come now to the first issue: Did the judge err by admitting in evidence knives found near the defendant at the time of his arrest ten weeks after Nicholson was assaulted? Prior to the presentation of evidence, counsel discussed with

the judge the admissibility of evidence the Commonwealth proposed to offer, that, at the time of the defendant's arrest, there was an altercation between the defendant and the arresting officers, that the defendant was under the influence of narcotics, that he gave the officers a false name, and that there were two knives on the ground in the vicinity of the motor vehicle that the defendant, together with others, had occupied. The prosecutor contended that the evidence should be admitted solely to show the defendant's consciousness of guilt. The judge was not persuaded that the proposed evidence would warrant a finding that the defendant was conscious of guilt of the crimes with which he was charged. Accordingly, the judge announced that he would not admit the evidence on that basis, but he did agree that evidence that the arrest took place and where it took place as well as the fact that "a knife was seized from the person" would be admissible.

After several witnesses had testified, the prosecutor told the judge that his next witness would be Officer John Mercurio. Mercurio was one of the arresting officers. The judge repeated what he had said before, that the jury were not to hear the evidence proposed by the prosecutor as bearing on consciousness of guilt. Then the following occurred: THE JUDGE: "Now, it is my understanding from you [defense counsel], that you do not want the knives admitted into evidence." DEFENSE COUNSEL: "That's right, Your Honor." THE JUDGE: "Okay. But you would have agreed, am I correct, that the District Attorney can say, during the course of the arrest knives were retrieved in the immediate vicinity of the defendant outside the car?" DEFENSE COUNSEL: "That's right, as long as it is made clear that there were two other people who were outside the car at that point so it was not under the immediate control of the defendant." THE PROSECUTOR: "That may be the defendant's evidence, Judge. I don't know that to be my evidence."

Defense counsel asked the judge to instruct the jury that "they can't make a logical connection [between the knives at the scene of the arrest and the weapon by which the victim

was stabbed] because there were two months between the night of the stabbing and the time that these knives were found." The judge refused to give that instruction. He said that he was admitting the evidence "for whatever considera- tion the jury might want to give to evidence that the defend- ant carries or is in possession of knives on occasion."

Officer Mercurio testified, among other things, that on No- vember 19, 1987, which was approximately ten weeks after the stabbing, he and another officer, having received some information about the defendant, went to a parking lot at 434 Border Street in East Boston, where a certain vehicle was parked. According to Mercurio's testimony, there were three or four persons in the vehicle in the front and back seats, the defendant was in the back seat, and Mercurio asked the defendant to step out of the vehicle and put his hands on it. The prosecutor then asked Mercurio, "And, Of- ficer, when you placed the defendant under arrest outside of the motor vehicle, did you observe any objects in the vicinity of his person? Were there any objects on the ground when you placed him under arrest?" Mercurio answered, "Yes. There were two knives." Following a question and answer of no import here, the following occurred: THE PROSECUTOR: "Now, did you find these two knives on the ground, sir?" THE WITNESS: "I did, yes." THE PROSECUTOR: "If I may ap- proach the witness, Your Honor." THE PROSECUTOR: "I show you an object, sir, and ask if you can identify that object." THE WITNESS: "Yes. That's the — one of the knives that were at the scene on the ground at 434 Border Street." The prosecutor then offered the knife as an exhibit, defense coun- sel objected, and the knife was admitted as an exhibit. The officer then testified without objection that a second object he was shown by the prosecutor was the other knife found at 434 Border Street on the ground, and that knife was offered and admitted in evidence without objection. On cross-exami- nation, defense counsel brought out that, at some point, while the vehicle was parked, all the occupants got out of it. There was no evidence that, when the officer first saw the knives on

the ground, anyone other than the defendant was outside the vehicle.

As the recitation above demonstrates, the jury heard about the knives and saw them, without objection, and one of the two knives marked as exhibits was marked without objection. In those circumstances, even if the one knife that was marked as an exhibit over objection was admitted erroneously, it is difficult to see how the defendant could have been harmed by that error.

In any event, we are satisfied that the judge acted within the limits of his lawful discretion when he admitted in evidence the testimony about the presence of the knives at the scene of the arrest and the knives themselves. "Whether evidence is relevant in any particular instance and whether the evidence is so inflammatory in nature as to outweigh its probative value and thus preclude its admission are questions addressed to the sound discretion of the trial judge. . . . The test of relevancy is 'a matter on which the opinion of the trial judge will be accepted on review except for palpable error.' " *Commonwealth* v. *Booker*, 386 Mass. 466, 469-470 (1982), quoting *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981). "The fact that, at or about the time of a crime, a defendant had a weapon that could have been used in committing the crime is admissible in the judge's discretion. '[I]t is commonly competent to show the possession by a defendant of an instrument capable of being used in the commission of the crime, without direct proof that that particular instrument was in fact the one used.' " *Commonwealth* v. *Toro*, 395 Mass. 354, 356 (1985), quoting *Commonwealth* v. *O'Toole*, 326 Mass. 35, 39 (1950). *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 229-230, cert. denied, 389 U.S. 916 (1967). Also, whether the knives were discovered at a time too remote from the crime to be probative is a decision within the trial judge's discretion. *Commonwealth* v. *Chasson*, 383 Mass. 183, 187 (1981). *Commonwealth* v. *Watkins*, 375 Mass. 472, 491 (1978).

The defendant suggests that the judge admitted the evidence about the knives merely to show the defendant's bad

character, that is, his propensity to commit crimes. Except in special circumstances, not present here, such evidence would be inadmissible. In support of that contention, the defendant points to the judge's statement that he was admitting the evidence "for whatever consideration the jury might want to give to evidence that the defendant carries or is in possession of knives on occasion." Although the judge's comment is susceptible of the construction the defendant gives it, we think the statement also may fairly be construed to mean that the evidence was admitted to show that at a time not too remote from the stabbing the defendant possessed instruments that could have been used against the victim. As the cases cited above, and numerous other cases as well, have declared, the admission of such evidence is within the discretion of the judge. We conclude not only that the defendant has failed to demonstrate harm from the admission in evidence of the one knife to which he objected, but also that admission of all the evidence with respect to the knives was within the judge's discretion.

Turning to the second issue, our question is whether, by interrogating Nicholson, the victim-witness, concerning his ability to identify his assailant, the judge impermissibly "put his thumb on the scale," as the defendant asserts he did. Nicholson lost his hearing when he was three years old. He was unable to hear or speak. His testimony was presented through two interpreters. One of the interpreters explained to the jury how the testimony would be presented: "My colleague, Linda Harris, is a deaf person who is a certified interpreter and . . . there will be a three-way conversation between — to interpret his testimony to the court. A question will be asked by an attorney. As an interpreter who is hearing, I will hear the question and interpret that to my colleague, Linda who is deaf. She will then, in turn, interpret that to the witness who is testifying. When the reverse happens, the witness will make a statement, my colleague, Linda, will interpret that to me, and I will voice for the record and the court his answer, but all of the interpretation is his own words. It is not the interpreter answering for him. It

is he that is testifying." The interpreter explained the use of two interpreters instead of only one by saying, in part, that "a deaf person . . . has a lot of experience that I wouldn't have, has grown up with deaf people, has a more native understanding, native knowledge of the language. [Sign language is] a very different language than English."

On direct examination, Nicholson testified that, on the evening he was attacked, he did not get a good look at his assailant. The prosecutor did not ask for an in-court identification. On cross-examination, defense counsel asked the witness "to look around the courtroom . . . and tell me, do you see the man who robbed you and stabbed you on September 4, 1987?" Nicholson answered, "No," and the cross-examination ended. On redirect, the prosecutor asked, "Is your answer that the man who stabbed you is not here or is your answer that you don't remember the man who stabbed you?" Over defense counsel's objection, the witness replied, "There's two guys that were walking out in the hallway. He didn't look like that." The prosecutor asked, "When you looked around inside this courtroom, Mr. Nicholson, did you recognize the person who stabbed you?" Over objection, the witness said, "No. I wanted to see who it was that did it to me, yes." Then the judge inquired, "Mr. Nicholson, are you saying the person who stabbed you is definitely not in this courtroom?" The witness's answer was, "I saw the guy three times in the bar that night but I don't think he is here." Then, in response to a question put by the prosecutor, the witness testified that he thought he would recognize the assailant if he were in the courtroom.

After a further question and the sustaining of an objection, a side bar conference took place which we repeat in relevant part. The judge observed, "The problem is, there was apparently an incident outside this courtroom, out in the corridor with these two gentlemen who are sitting in the back row. As I read one of his answers, I'm not sure if he is referring to the people inside the enclosure or outside the enclosure." The prosecutor replied, "My feeling is that he is confused which is why I would specifically like to ask him, are you positively

saying this is not the man or are you saying you don't know that it's the man." The judge then expressed both his view that "[t]he young man is confused," and his uncertainty about whether the witness had been referring to a possible "problem outside with the two individuals who [were] sitting in the back of the court." The judge stated that "either through [himself] or one or both counsel, [the witness] should be able to look at the defendant and say that he is excluding him as a person who stabbed him or he is not sure or he is the person." In response to defense counsel's objection that the prosecutor had had an opportunity to do that on direct examination and that, just before the conference, the prosecutor was simply looking "for a different answer," the judge said, "Well, the problem is, I think he is excluding the participants in this trial and he is looking out into the audience section. . . . This young man is a very intelligent young man. He knows who the defendant is." Defense counsel then said, "Well, I have no objection to you asking the question, Your Honor." Whereupon, the side bar conference was over.

The judge addressed the witness as follows: THE JUDGE: "Mr. Nicholson, I would like you to look at this young man sitting next to the attorney, Ms. Donovan, the young man sitting here with the white pullover jersey at this table, and I would ask you this, are you able to say that he is not the man who stabbed you, he is the man who stabbed you, or you do not know or anything else you would like to say." THE WITNESS: "My mind is blank — let me check." THE JUDGE: "Do you understand, sir, the question that I am asking you? I am asking you whether or not you can say he is the man, he is not the man or you cannot say whether or not he is or is not the man?" THE WITNESS: "He looks similar. He looks familiar." THE JUDGE: "Well, that doesn't answer my question, Mr. Nicholson. Can you say he is the man, he is not the man or you cannot say whether he is [or] not?" THE WITNESS: "Yes, I think so." THE JUDGE: "I will ask the question again to you, Mr. Nicholson. Can you say he is, he is not, or whether you are not sure?" THE WITNESS: "Yes, I think he is." THE JUDGE: "What's the answer? I think he is?" THE

INTERPRETER: "The interpretation was, yes, he is." THE JUDGE: "Did you not say a few minutes ago that the man who stabbed you was not in this courtroom?" THE WITNESS: "Just, I can't remember. It's because I can't remember and I don't seem to be able to remember." THE JUDGE: "You can't remember what, sir?" THE WITNESS: "I can't remember, you know, what the hair was like, may be a mustache. Let me think — I'm trying to remember. It looks similar to him. There was a mustache —" THE JUDGE: "Is it fair to say that you are not sure, sir?" THE WITNESS: "He looks like the guy. I'm trying to remember what he looks like when he was walking." DEFENSE COUNSEL: "I object, Your Honor. Could I approach side bar?" THE JUDGE: "Yes. Come on over." Whereupon the following discussion occurred. DEFENSE COUNSEL: "Your Honor, this man is completely confused now. I mean, he looks physically shaken. I think he is responding now to the fact that he is being drilled and people keep asking him, is this the man, is this the man, and now he is kind of wavering and changing his mind." THE JUDGE: "He is not being drilled and the way he is being asked was three simple alternatives for an answer, whether he can identify the man, whether he cannot identify the man, or whether he is unsure whether or not he is the man, and he is well composed. He is struggling. He is working hard. He is trying to be fair in my estimation." DEFENSE COUNSEL: "Well, I object to the whole line of questioning because he was asked —" THE JUDGE: "You object to the line of questioning?" DEFENSE COUNSEL: "Yes, because he was asked if the man was in the room and he said, no." THE JUDGE: "Yes, and then I told you that it is the Court's distinct impression that he was talking about the courtroom, he was talking of an area beyond the bar, and that is why this Court undertook, with your assent, to ask those questions, and I am going to ask him several more questions. I think it is in the interests of justice that this be done." DEFENSE COUNSEL: "Please note my objection for the record." Whereupon the discussion at side bar concluded. THE JUDGE: "Mr. Nicholson, I ask you again, and you answer to the best of your ability, whether or

not the young man you just looked at is the person or whether he is not the person or whether, in your own mind, you are simply not sure whether [h]e is or is not. Just answer to the best of your ability. Relax." THE WITNESS: "It was a long time ago." THE JUDGE: "I emphasize, it is. To your present recollection today at this moment, can you say it is the person who stabbed you, it is not the person who stabbed you, or in your own mind, you are unsure? Whatever. Your honest impression, under oath." THE WITNESS: "I'm trying to think of what he looked like. He looks similar." THE JUDGE: "Well, then, sir, is it fair to say that at this moment you are unsure?" THE WITNESS: "Yes."

The judge gave both counsel an opportunity to explore the subject further. The prosecutor had no further questions. Defense counsel asked Nicholson, "[Y]ou are not sure whether this is the man who robbed you or stabbed you, is that right," and Nicholson answered, "Yes, I'm not sure."

It is true that "the effect on the jury of whatever a judge says or does may be significant," *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 846 (1980), and therefore a judge should use restraint in interrogating witnesses. *Id.* at 847. However, "there may be occasions in which a trial judge quite appropriately asks questions to clarify a point, to prevent perjury, or to develop trustworthy testimony." *Id.* Of course, the judge must be careful not to reveal partisanship or bias. *Commonwealth* v. *Campbell*, 371 Mass. 40, 45 (1976). *Commonwealth* v. *Festa*, 369 Mass. 419, 422 (1976). The judge's questioning of Nicholson was appropriate. Not only was there an ever-present danger that the meaning of questions and answers would be lost in the two-step translation by the interpreters, but also the witness's demeanor and answers to counsels' questions fairly alerted the judge to the need for clarification of the witness's testimony. Finally, the judge's determination that clarification was needed was borne out by the witness's testimony following the judge's questions. Whereas, before the judge's involvement, which was not overbearing, Nicholson answered, "No," to defense counsel's question as to whether he saw his attacker in the

courtroom, he subsequently answered, "Yes, I think he is," or "yes, he is," to the judge's question whether the defendant was the man who had stabbed him, and ultimately he left it that he was unsure. Thus, even if the defendant fairly preserved the issue whether the judge's questions to Nicholson were proper,[1] we are satisfied that there was no error.

We are also satisfied that there is no merit to the defendant's argument, presented on appeal for the first time, that the judge erred by instructing the jury that "both counsel in their arguments have conceded that the victim has not made an identification of the defendant as the person who allegedly assaulted and robbed him on the day in question. On the basis of his evidence, at best, he is saying he is unsure." Ordinarily, a judge should not usurp the jury's function by instructing them with respect to how particular testimony should be construed. Here, however, despite defense counsel's emphasis in her closing argument on the victim's unequivocal answer, "no," to her question whether the assailant was in the courtroom, the judge was not put on notice that there was any real question concerning whether the victim had finally adhered to the position that he was unsure whether the defendant was the person who had attacked him. Indeed, the failure of counsel to object to the instruction tends to confirm that there was no question about how the witness had left it with the jury.

The last issue to be addressed is whether the prosecutor impermissibly vouched for the credibility of either Lori Heil, the only witness who identified the defendant as the assailant, or of the victim, Nicholson. During Heil's direct examination, the prosecutor elicited testimony that Heil was then under indictment on three charges stemming from the robbery and stabbing of Nicholson, and that she had agreed with the Commonwealth "to testify truthfully" against the defendant in return for which the Commonwealth would

---

[1] It is arguable that defense counsel's statement, "Well, I have no objection to you asking the question, Your Honor," was only an agreement that, if the question were to be asked, which it should not be, it was all right for the judge, rather than the prosecutor, to ask it.

make a sentencing recommendation favorable to Heil on one indictment and would move for dismissal of the other indictments. There was no other testimony emphasizing the agreement's requirement that Heil testify truthfully. The defendant does not argue that the questions about Heil's agreement to testify truthfully by themselves are cause for reversal, but instead he contends that the prosecutor "played upon the inevitable impact of Heil's testimony regarding her plea agreement" when, in his closing argument to the jury, he "improperly express[ed] his personal belief" in Heil's credibility. Also, the defendant asserts, the prosecutor in his argument improperly vouched for Nicholson's credibility.

Specifically, the defendant points to the following language in the prosecutor's summation: "Lori Heil, when she told you that it was the defendant and Veronica Surface that left her car on that evening, Lori Heil told you the truth. Lori Heil told you the truth, and how do you tell if someone is telling the truth? None of you ever met Lori Heil before this trial began. You don't know what she is all about. How do you measure if someone is telling the truth from that witness stand? Well, one way is to look at the story that you know is true, Scott Nicholson's story. Look at his story. How does it match up? How does it dovetail with Lori Heil's story? And if they match up, and if they dovetail and fit together, isn't that another way of Scott Nicholson saying, well, hey, they match up, Lori Heil is telling you the truth, specifically with respect to the identifications in this case and that's the crux of this whole case." Immediately following that quoted portion of his argument, the prosecutor attempted to show the "matching" or "dovetailing" of Heil's and Nicholson's testimony, and he attempted to explain away any divergence in their accounts. Then followed another portion of the argument the defendant characterizes as impermissible vouching: "What motive? What motive did Lori Heil have to lie against this defendant? The only evidence you heard is that the defendant was an acquaintance of hers for approximately two months. There is no evidence at all why she would have any single reason to frame this defendant, if it is a frame-up.

She could have framed anybody. Why this defendant? It just doesn't make sense. She is telling you the truth."

The prosecutor had earlier argued to the jury that "there is no evidence at all in this case that Scott Nicholson lied." The defendant directs our attention to the argument that came next: "Scott Nicholson told you the truth. . . . Scott Nicholson was telling you the truth when he said that the man took that knife, after they had taken his money, and that that man then got on top of Scott Nicholson and stuck the knife into his throat, not once, not twice, but three times, and then the man went back to the car."

Also, the defendant asserts that elsewhere in his argument, the prosecutor argued that Nicholson "told you the truth" and "didn't lie." We insert the context in which those statements were made. The prosector argued that "[i]t is no mystery" why Nicholson could not identify the man who attacked him, but could identify Veronica Surface. He argued: "Scott Nicholson told you, he told you the truth, he is an alcoholic. He drank at least twelve beers that night. Scott Nicholson is a man, he has some severe disabilities, but a man who is an alcoholic, who has twelve beers, who goes to that bar that he had never gone to before. What does he go there for? To watch television, to have dinner, he goes to talk to two women. He goes to talk to women. Scott Nicholson is a man and what did he do at the bar? In that dimly lit bar, what did he do? Was he paying attention to the defendant who he had never met before? Of course not. He was paying attention to the two young women that he had met there. He was trying to teach sign language, speak sign language with them, having some drinks with them.

"It was Veronica Surface who kept taking his hand and eventually took him out of the bar. Is that so unreasonable to believe? Scott Nicholson was paying attention to the two women. He told you he wasn't paying attention to the defendant. That's why Scott Nicholson was unsure if this is the man that stabbed him. Scott Nicholson was honest when he told you he is unsure. He didn't lie. You saw him struggle on the stand."

The defendant is not entitled to appellate review of the prosecutor's statements, since he did not object to them at trial. Nevertheless, we review them to determine whether there was a substantial risk of a miscarriage of justice. *Commonwealth* v. *Glass*, 401 Mass. 799, 805-807 (1988). *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 n.8 (1987). *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416 (1978). See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). In *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989), which was decided after the present case was tried, we recognized that "[a] prosecutor's position is a delicate one. The prosecutor must be free to argue that . . . a witness is credible, but may not explicitly or implicitly vouch to the jury that he or she knows that the witness's testimony is true. Vouching can occur if an attorney expresses a personal belief in the credibility of a witness . . . or if an attorney indicates that he or she has knowledge independent of the evidence before the jury verifying a witness's credibility." We think that the quoted portions of the prosecutor's jury argument, together with the descriptions of unquoted portions thereof set forth above, fall far short of either constituting the prosecutor's assurance of his personal belief in the credibility of the witness or of indicating that the prosecutor possesses information not in evidence which verifies the witness's credibility. Rather, it is clear that, throughout his argument, the prosecutor's focus was on the credibility of the witnesses as manifested by their testimony. The prosecutor's statements in support of Heil's and Nicholson's credibility were appropriately "based on the demeanor and motive of the witnesses and the consistency of their stories." *Commonwealth* v. *Stone*, 366 Mass. 506, 516 (1974). See *Commonwealth* v. *Kozec*, *supra* at 521. We conclude that there was no prosecutorial impropriety.

*Judgments affirmed.*